**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| United States of America, | Case No. 19-cr-224 (ECT/DTS) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| Travis Lee Beckjorden, | |
| Defendant. | |

Jeffrey S. Paulsen, Assistant United States Attorneys, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis MN 55415 (for the Government); and

Charles L. Hawkins, Charles Hawkins Law Office, 150 South Fifth Street, Suite 2860, Minneapolis MN 55402 (for Defendant Travis Lee Beckjorden).

This matter is before the Court on Defendant Travis Lee Beckjorden's Motion to Suppress Confessions, Admissions or Statements Made in the Nature of Confessions Made by the Defendant, (ECF No. 29), Motion to Suppress Evidence Obtained through Illegal Search on February 28, 2019, (ECF No. 30), Motion to Suppress Confessions, Admissions or Statements Made in the Nature of Confessions Made by the Defendant on July 3, 2019, (ECF No. 31), and Motion to Suppress Evidence Obtained through Illegal Search on July 3, 2019, (ECF No. 32). These motions have been referred for a report and recommendation under 28 U.S.C. § 636 and D. Minn. LR 72.1.

A hearing was held October 31, 2019, and the Government offered the testimony of Bryan Madsen, Owatonna Police Officer Joshua Lee, Rochester Police Officer Daniel Swanson, and Olmstead County Sheriff's Sergeant Jonathan Jacobson. (ECF No. 39; Tr. of Oct. 31, 2019 Mot. Hrg., ECF No. 46). The Court received into evidence Gov't Ex. 1

(body cam video) and Def. Ex. 1–3 (still images from security footage). Post-hearing briefing is now complete, (ECF Nos. 47, 48), and the Court recommends that Beckjorden's motion to suppress statements made on February 28, 2019 be granted and all his other motions be denied.

I.   **FINDINGS OF FACT**

   A.   **February 28, 2019**

On February 28, 2019 at around 12:22 p.m., Defendant Travis Lee Beckjorden entered the Fleet Farm store in Owatonna, Minnesota. (Tr. 6:9–21, 14:17–23). Bryan Madsen, Fleet Farm's Loss Prevention Team Lead, started observing Beckjorden via the store CCTV system at around 12:40 p.m. because Beckjorden was at the knife display in the sporting goods section and knives are a commonly stolen item from Fleet Farm. (Tr. 6:9–7:24, 14:13–15:1). Beckjorden was shopping the knives and eventually put several knives in his basket, which Madsen found concerning because customers rarely purchase more than one knife at a time. (Tr. 7:25–8:9).

Beckjorden put two knives in his shopping basket and was also holding a packaged hunting knife in the same hand that was holding the shopping basket handle. (Tr. 8:14–20). Beckjorden proceeded to a quiet aisle in the sporting goods section then used a personal knife to cut open the packaging for the hunting knife. (Tr. 8:14–23).[1] Once the packaging was open, Beckjorden removed the hunting knife and sheath then discarded the packaging behind some camping merchandise on the store shelf. (Tr. 9:13–17). Beckjorden put the hunting knife into his front sweatshirt pocket. (Tr. 9:21–10:2, 23:18–

---

[1] The personal knife appeared to be a pocketknife and the hunting knife was approximately 8-10 inches long. (Tr. 8:21–9:1). The hunting knife sells for $29.99. (Tr. 9:7–12).

25, 24:13–24). At some point while in the store, Beckjorden moved the hunting knife to his waistband. (Tr. 24:1–8, 24:13–24).

It is Fleet Farm company policy to call law enforcement for thefts of knives or guns, so Madsen called the Owatonna Police at approximately 1:02 p.m. (Tr. 10:3–8, 14:24–15:4). Madsen informed law enforcement that there was an adult male in the process of shoplifting knives. (Tr. 10:9–12). Madsen provided law enforcement with a description of Beckjorden and continued to watch him via the store's security camera system. (Tr. 10:15–23). Law enforcement was dispatched to the store. (Tr. 26:21–27:5).

Beckjorden put one of the unopened knives from his shopping basket back onto the counter from where he grabbed it; one knife remained in his shopping basket and the hunting knife was still concealed on his person. (Tr. 10:24–11:13). Beckjorden went to the plumbing section where he started to use his personal knife to cut open a second knife's packaging, but a customer walked down the aisle so Beckjorden discarded that second knife. (Tr. 11:5–9). Madesen never saw Beckjorden remove the hunting knife concealed on his person. (Tr. 19:6–20:11).

After spending some time in the plumbing section, Beckjorden proceeded to the store checkout where he purchased some plumbing supplies but did not pay for the hunting knife concealed on his person. (Tr. 11:10–12:11). Madsen was on the telephone with Owatonna Police Officer Joshua Lee who was waiting right outside Fleet Farm's front entrance. (Tr. 11:23–12:11, 27:14–29:10). Madsen and two other employees then followed Beckjorden as he exited the store and confronted him. (Tr. 12:12–21, 17:13–18, 29:20–24; Def. Exs. 1–3).

3

At the same time, three law enforcement officers confronted Beckjorden. (Tr. 29:11–24, 37:21–38:22). Law enforcement told Beckjorden to stop, drop the bag he was carrying, and not reach into his pockets. (Tr. 35:7–18, 39:13–22). Beckjorden complied. (Tr. 41:11–17). Officer Lee had his taser drawn. (Tr. 38:18–39:12). Law enforcement immediately handcuffed Beckjorden because they suspected him of having knives on his person. (Tr. 29:25–30:5, 41:14–22). Law enforcement—Officer Schumaker—then conducted an immediate pat search of Beckjorden outside the store. (Tr. 30:8–15, 41:23–42:7). Officer Schumaker found Beckjorden's personal knife and the hunting knife; the hunting knife was in Beckjorden's waistband. (Tr. 30:16–31:8).

Law enforcement moved Beckjorden to a more controlled location, Fleet Farm's loss prevention office, due to the customers walking around. (Tr. 31:9–19, 41:23–42:7; *see* Tr. 12:17–13:18). Once inside, law enforcement searched Beckjorden further. (Tr. 32:4–11). In the right, rear side of Beckjorden's waistband law enforcement found a loaded Kel-Tec PF-9, a small handgun. (Tr. 32:12–33:16). Law enforcement asked Beckjorden about the gun, and he responded that he did not know he had a gun on him. (Tr. 33:17–25).[2] Beckjorden also advised law enforcement that he was a convicted felon. (Tr. 34:6–8).

Law enforcement continued searching Beckjorden, finding a small folding knife in his front right pocket and a knife concealed in his left boot. (Tr. 34:16–35:1). Law enforcement also found some methamphetamine in his right inside pocket and a smoking vape with marijuana residue inside his front left pocket. (Tr. 35:2–6, 35:25–36:3). Beckjorden was arrested for misdemeanor theft, felon in possession of a firearm, carrying

---

[2] The Government has agreed not to use this statement in its case-in-chief. (Tr. 34:1–4).

4

a weapon without a permit, possession of a controlled substance, and possession of a small amount of marijuana. (Tr. 35:19–24). Beckjorden was not read a *Miranda* advisory at any point during this interaction. (Tr. 42:13–43:19).

While law enforcement brought Beckjorden back inside the store, Madsen returned to the sporting goods section to retrieve the empty knife packaging. (Tr. 12:24–13:13). By the time Madsen returned to the loss prevention office, the stolen knife was sitting on a table. (Tr. 13:7–22). Also on the table was a firearm. (Tr. 13:23–14:1). The empty packaging matched the hunting knife retrieved from Beckjorden. (Tr. 13:7–22).

**B.    July 3, 2019**

On July 3, 2019, at approximately 3:30 p.m., Rochester Police Officer Daniel Swanson was dispatched to Autonomy Tattoo parlor in Rochester, Minnesota. (Tr. 45:24–46:9, 54:13–15). Officer Swanson spoke to J.S., an employee of Autonomy Tattoo, who had been outside smoking a cigarette behind the building when he saw Beckjorden, a former owner and business partner of Autonomy Tattoo,[3] in a red Chevrolet pickup truck across the street. (Tr. 46:14–47:13, 50:2–4, 56:1–11, 63:23–64:10). Beckjorden asked J.S. the location of Brian, the manager/owner of Autonomy Tattoo. (Tr. 47:14–22). J.S. responded that Brian did not work Wednesdays. (Tr. 47:14–24). Beckjorden then said to J.S.: "Tell that [motherf***er] that I'm looking for him" and that he would return at 9:00 p.m. (Tr. 47:25–48:10). Beckjorden then reached out of his vehicle with his right hand holding a black pistol and tapped it on the side of the vehicle door. (Tr. 48:21–49:7). J.S.

---

[3] J.S. reported that Beckjorden had embezzled thousands of dollars from the tattoo parlor and was fired by Brian. (Tr. 63:7–19, 63:23–64:10). J.S. also stated to Officer Swanson that Beckjorden had robbed Autonomy Tattoo on three prior occasions before July 3, 2019. (Tr. 48:15–20, 56:12–59:13). Officer Swanson believed Beckjorden to no longer be affiliated with Autonomy Tattoo. (Tr. 63:13–19).

5

perceived this as a threat to Brian and was scared but also glad that Brian was not present for Beckjorden to shoot. (Tr. 48:11–14, 49:4–9). J.S. quickly went inside the tattoo parlor and locked all the doors then called the police. (Tr. 49:13–50:1). Officer Swanson interviewed J.S. approximately 10 to 20 minutes following this incident and J.S. appeared "very visibly upset," wanting to remain indoors out of the open. (Tr. 49:10–17, 54:16–55:14).

Another officer went to speak with Brian at his home. (Tr. 62:9–12). Brian reported seeing Beckjorden's truck drive by his house "very close in time" to the incident at Autonomy Tattoo. (Tr. 62:13–63:6, 64:13–66:1). This information was relayed to law enforcement at approximately 3:46 p.m. (Tr. 82:1–4). At some point thereafter, a Rochester police officer aired over the radio that they possibly saw Beckjorden's red truck approximately three miles from Brian's residence. (Tr. 71:13–20, 82:17–25). Thereafter, Olmstead County Sheriff's Sergeant Jonathan Jacobson sent deputies to try to intercept the red truck. (Tr. 72:2–5).

At approximately 4:00 p.m., Olmstead Sheriff's Deputy Nathan Trueblood encountered Beckjorden' truck traveling northbound on U.S. Highway 52 and followed it. (Tr. 72:6–25). Beckjorden stopped at a car dealership in Pine Island, Minnesota, a town about 15 miles north of Rochester. (Tr. 73:1– 9; Gov't Ex. 1 at 5:48–5:51). Beckjorden exited his vehicle via the driver's side door. (Tr. 73:14–74:11, 77:13–19; Gov't Ex. 1 at 6:12–7:50). Sergeant Jacobson exited his squad vehicle with his rifle drawn to provide cover to Deputy Trueblood while he made contact then handcuffed Beckjorden. (Tr. 73:14–74:11, 77:13–19; Gov't Ex. 1 at 6:12–7:50). Sergeant Jacobson informed Beckjorden he was under arrest while Deputy Trueblood searched Beckjorden's person,

6

locating a loaded pistol magazine in his front pocket. (Tr. 74:12–24; Gov't Ex. 1 at 8:10–9:30). Beckjorden was then placed in a squad car. (Tr. 80:7–15, 86:3–6).

Sergeant Jacobson believed there may be a gun located inside Beckjorden's truck based on the time frame of events between the initial police call from J.S. to the apprehension of Beckjorden. (Tr. 74:25– 75:8). The truck was locked and Sergeant Jacobson used Beckjorden's keys to get in. (Tr. 80:16–23, 86:3–6; Gov't Ex. 1 at 12:25–12:30, 14:40–14:55). Sergeant Jacboson searched Beckjorden's truck, locating two loaded firearms inside: a Taurus .380 was on the floorboard tucked underneath the front passenger seat and a Kahr .40 caliber was in the seat pocket behind the front passenger seat. (Tr. 75:9–76:24). Law enforcement also located knives, a professional lock pick set, and some methamphetamine. (Tr. 76:25–77:12).

Beckjorden had been the only occupant of the truck. (Tr. 77:20–21). The Rochester Police Department did not wish to seize the truck for evidence, so Sergeant Jacobson contacted the car dealership on which it was parked who requested the truck be towed from the property. (Tr. 77:22–78:8, 78:24–79:6). The vehicle was towed, but not into law enforcement's custody. (Tr. 78:9–16, 78:24–79:6).

## II. ANALYSIS

### A. February 28, 2019

#### 1. The Arrest

Beckjorden argues that under both Minnesota law and the U.S. Constitution, a police officer may not make a warrantless arrest for a misdemeanor unless the offense has been committed in that officer's presence. Because law enforcement did not see Beckjorden steal the hunting knife, he argues they violated the Fourth Amendment in

7

arresting him as he existed the store. The Government responds that law enforcement had reasonable suspicion to detain Beckjorden for an investigatory stop. Based on Madsen's report, buttressed by the officers' pat down search of Beckjorden wherein the stolen hunting knife was located, the Government asserts law enforcement had probable cause to arrest Beckjorden. Thus, the Government argues, the more thorough search in the loss prevention office was a valid search incident to arrest. This Court agrees with the Government.

"A police officer 'may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Fields*, 832 F.3d 831, 834 (8th Cir. 2016) (citing *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000), and *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "The existence of reasonable, articulable suspicion is determined by the totality of the circumstances, taking into account an officer's deductions and rational inferences resulting from relevant training and experience." *United States v. Horton*, 611 F.3d 936, 940 (8th Cir. 2010) (citing *United States v. Arvizu*, 534 U.S. 266, 273–74 (2002)).

Here, Madsen is employed by Fleet Farm as a Loss Prevention Team Lead and has worked for Fleet Farm for seventeen years. He carefully observed Beckjorden for some 20 minutes and saw him remove one knife from its packaging and attempt to remove another. Madsen called the police and continued observing Beckjorden and relaying accurate details to law enforcement. Madsen gave law enforcement a description of Beckjorden and noted when—down to the second—he was leaving through the store's front door and followed him out with two other employees. Under the totality of the circumstances based on all the information relayed by Madsen, law enforcement had

reasonable, articulable suspicion that Beckjorden was in the process of stealing from Fleet Farm. Thus, it was permissible to conduct a brief, investigatory stop.

During a *Terry* stop, an officer may do a pat-down search for protective reasons "if he has a reasonable, articulable suspicion that the person may be armed and presently dangerous." *United States v. Davison*, 808 F.3d 325, 329 (8th Cir. 2015) (quotation omitted). The officer "must be able to point to particular facts from which he reasonably inferred that the individual was armed and dangerous." *Sibron v. New York*, 392 U.S. 40, 64 (1968). Law enforcement here had reason to believe Beckjorden was armed and presently dangerous because he had at least two concealed knives on his person: a large hunting knife and a small pocketknife.

Once that hunting knife was located during the protective pat-down search, law enforcement had probable cause to believe Beckjorden had just shoplifted. The Supreme Court has held that an officer may arrest an individual without violating the Fourth Amendment so long as he or she has probable cause to believe that individual committed even a very minor criminal offense in that officer's presence. *Atwater v. City of Lago Vista*, 535 U.S. 318, 354 (2001). Further, while "the Supreme Court has not decided whether the Fourth Amendment permits a warrantless arrest for a misdemeanor when the alleged offense did not occur in the presence of the arresting officer," the "prevailing view is that the Constitution does not require that a misdemeanor offense must have occurred in the officer's presence to justify a warrantless arrest." *Veatch v. Bartels Lutheran Home*, 627 F.3d 1254, 1258–59 (8th Cir. 2010). So whether the shoplifting offense is considered as

occurring in law enforcement's presence or not, law enforcement had probable cause to arrest Beckjorden.[4]

Since law enforcement had probable cause to arrest Beckjorden, it was permissible to conduct a search of his person incident to that arrest. *United States v. Robinson*, 414 U.S. 218, 224 (1973). Accordingly, evidence recovered from Beckjorden's person on February 28, 2019 should not be suppressed and his motion should be denied.

**2.   The Statement**

Under the Fifth Amendment, *Miranda* warnings are "required when interrogation is 'initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.'" *United States v. New*, 491 F.3d 369, 373 (8th Cir. 2007) (quoting *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

This Court has already concluded that Beckjorden was under arrest on February 28, 2019 once he was handcuffed leaving the Fleet Farm store. He was then brought back into the loss prevention office. It is undisputed that Beckjorden did not receive a *Miranda* advisory at any point during the Fleet Farm interaction. The testimony further established that, in searching Beckjorden's person further, law enforcement asked Beckjorden about the gun. Beckjorden responded that he did not know he had a gun on

---

[4] Beckjorden's reliance on state law for the standard of arrest is misplaced. First, "warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution" and "state restrictions do not alter the Fourth Amendment's protections." *Virginia v. Moore*, 553 U.S. 164, 176 (2008). Second, while Beckjorden cites the general Minnesota statute that requires misdemeanors to have been committed in the officer's presence for arrest, MINN. STAT. § 629.34, subd. (c)(1), Minnesota has a more specific statute governing theft from businesses which allows a police officer to arrest a person without a warrant if that officer has, upon a charge being made by a merchant or merchant's employee, reasonable cause to believe that person has taken an article of value without paying for it, MINN. STAT. § 629.366, subd. 2.

10

him. While the context is unclear—that is, whether it was in response to police questioning—but Beckjorden also advised law enforcement that he was a convicted felon. While the Government agrees not to use Beckjorden's statement that he did not know the pistol was in his waistband, it has not made the same concession as to Beckjorden's statement that he knew he was a felon. Despite Beckjorden's memorandum addressing these statements as a whole, the Government offers no argument as to the constitutionality of using that second statement in its post-hearing briefing. (ECF No. 48, at 7 n.3) (discussing the pistol statement but not discussing the felon statement).

The Government bears the burden of proof when a defendant claims a statement was obtained in violation of *Miranda*. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986); *see Berghuis v. Thompkins*, 560 U.S. 370, 398 n.2 (2010) (discussing the government's burden with respect to *Miranda*). Absent any argument from the Government as to *any* of Beckjorden's statements made while in custody in the Fleet Farm loss prevention office, this Court concludes they were impermissibly obtained and must be suppressed. As such, Beckjorden's motion as to the February 28, 2019 statements should be granted.[5]

**B.  July 3, 2019**

**1.  The Search**

Probable cause to arrest "exists when the totality of facts known at the time of the arrest would justify a reasonable person in believing that the individual has committed or is committing an offense." *Hosea v. City of St. Paul*, 867 F.3d 949, 955 (8th Cir. 2017).

---

[5] This Court makes no decision as to the admissibility of these statements for impeachment purposes as referenced by the Government. Admissibility of otherwise inadmissible evidence is a decision best suited for the trial judge. This Court only recommends that the matter be raised through a motion in limine to the extent practicable.

All courts require "is the kind of 'fair probability' on which 'reasonable and prudent people, not legal technicians, act.'" *Florida v. Harris*, 568 U.S. 237, 243 (2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 235 (1983)).

Here, Officer Swanson encountered a visibly upset J.S. who had just witnessed Backjorden say he was looking for Brian and would return later while brandishing a pistol. J.S. was familiar both with Beckjorden and the man Beckjorden was seeking. J.S. identified Beckjorden and his red truck. A red truck was then seen close in time driving by Brian's residence, the man Beckjorden had just been looking for. Under the totality of the circumstances, law enforcement had probable cause to believe Beckjorden had committed a crime.

While Beckjorden intimates that the conflict between Brian and Beckjorden concerning the ownership and administration of Autonomy Tattoo was deeper than first appears, it was not law enforcement's duty to unravel a business dispute. Rather, law enforcement was concerned with the immediate threat: Backjorden was driving around and brandishing a handgun while looking for someone with whom he had a conflict. The information provided by J.S. was not unreliable merely because the business dispute over Autonomy Tattoo would be characterized differently by Beckjorden.

Once Beckjorden was arrested, law enforcement performed a search of his vehicle. "Probable cause to believe that an automobile contains contraband or evidence of criminal activity has long been held to justify a warrantless search of the automobile and seizure of the contraband." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (citing *Arizona v. Gant*, 556 U.S. 332, 347 (2009)). Similarly, under the search incident to arrest exception, officers may search a vehicle incident to an arrest if it is

reasonable to believe the vehicle contains evidence of the offense of arrest. *United States v. Stegall*, 850 F.3d 981, 984 (8th Cir. 2017) (citing *Gant*, 556 U.S. at 351).

Again, Beckjorden was in his truck while he brandished the pistol in front of J.S. Beckjorden then drove by Brian's residence. Thereafter, law enforcement encountered Beckjorden still driving the red truck. Once Beckjorden was arrested, law enforcement found a loaded pistol magazine on his person. Under the totality of the circumstances, there was fair probability that a pistol was located inside Beckjorden's truck, particularly where a loaded pistol magazine was on his person and Beckjorden had been seen with a pistol in his possession some 45 minutes earlier while sitting in that truck. Accordingly, this Court recommends denying Beckjorden's motion to suppress with respect to the search of his truck on July 3, 2019.

**2.     Statements**

While Beckjorden has moved to suppress statements related to the July 3, 2019 interaction with law enforcement, Beckjorden has made no argument in his post-hearing briefing as to the statements made during that encounter. Accordingly, this Court finds the matter waived and recommends denial of Beckjorden's motion. *See United States v. Rees*, 447 F.3d 1128, 1129 (8th Cir. 2006) (arguments not raised are waived); *Ridenour v. Boehringer Ingelheim Pharm., Inc.*, 679 F.3d 1062, 1067 (8th Cir. 2012) (same).

**III.    RECOMMENDATION**

For these reasons, **IT IS HEREBY RECOMMENDED** that:

1.     Defendant Travis Lee Beckjorden's Motion to Suppress Confessions, Admissions or Statements Made in the Nature of Confessions Made by the Defendant on February 28, 2019, (ECF No. 29), be **GRANTED**;

2. Defendant Travis Lee Beckjorden's Motion to Suppress Evidence Obtained through Illegal Search on February 28, 2019, (ECF No. 30), be **DENIED**;

3. Defendant Travis Lee Beckjorden's Motion to Suppress Confessions, Admissions or Statements Made in the Nature of Confessions Made by the Defendant on July 3, 2019, (ECF No. 31), be **DENIED**; and

4. Defendant Travis Lee Beckjorden's Motion to Suppress Evidence Obtained through Illegal Search on July 3, 2019, (ECF No. 32), be **DENIED**.

Dated: January 17, 2020        s/David T. Schultz
                               DAVID T. SCHULTZ
                               United States Magistrate Judge

## NOTICE

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.